1
2
3
4
5
6
7
8          **UNITED STATES DISTRICT COURT**
9          **SOUTHERN DISTRICT OF CALIFORNIA**
10

| | |
|---|---|
| UNITED NURSES OF CHILDREN'S HOSPITAL, | CASE NO. 13-CV-2133-LAB-JMA |
| Petitioner, | **ORDER ON DEFENDANT'S MOTION TO DISMISS** |
| vs. | |
| RADY CHILDREN'S HOSPITAL—SAN DIEGO, | |
| Respondent. | |

This is a labor case concerning a hospital's duty to arbitrate a discipline dispute with an employee.  Under a collective bargaining agreement between the hospital and the employee's union, discipline disputes that aren't resolved informally must go to arbitration, and the parties must agree on the issue or issues to be arbitrated.  The core question this case presents is whether the refusal to agree on an issue is, itself, the failure to arbitrate. In some cases it might be.  In this case it isn't.

As the Court will explain below, the alleged refusal to arbitrate in this case was simply the hospital's refusal to surrender certain factual and legal arguments on the front end of arbitration.  Even if those arguments are wrong, they're arguments the hospital has every right to preserve and make.

/ /

## I.    Factual Background

The real plaintiff in this case is Mary Bradley, formerly a respiratory therapist at Rady Children's Hospital assigned to its Neonatal Emergency Transport team.  This team is tasked with getting babies to the hospital, or from one hospital to another, who require advanced and immediate care.

On August 21, 2012, Rady issued a final written warning to Bradley for multiple instances of misconduct.  First, on July 22, 2012, she swore and used foul language during an air transport, and she also violated a "sterile cockpit" rule.  Second, during a separate air transport she swore at crewmembers who were moving an isolette.  Third, she threatened to file a HIPAA complaint against colleagues who reported that she wasn't fit for her job.  Bradley was placed on a 180-day performance improvement plan, and she was also removed from the Neonatal Emergency Transport team and offered a clinical position as "RT III." (Pet., Ex. B.)  It's not clear to the Court what RT III entails, but Bradley paints the move from the team to RT III as a demotion.  At a minimum, it came with a loss in pay.  (Pet. ¶ 9–10.)

At the time of the warning, Bradley was a member of the "Technical Division Bargaining Unit" at Rady, and as such, she is represented by United Nurses of Children's Hospital, the nominal plaintiff in this case.  Rady and the Union are parties to a collective bargaining agreement for the Bargaining Unit, and there is no dispute here that the agreement covers Bradley's discipline.  The collective bargaining agreement requires that any "discipline or discharge" of employees by supported by "just cause," and it also requires that discipline be "progressive" unless the circumstances "warrant more severe action." (CBA §§ 501–02.)  It also lays out a grievance process for employees to contest any discipline they receive.  (CBA Art. VI.)  And finally, it provides for arbitration if grievances can't be resolved informally, for example through mediation.  (CBA Art. VI.)  If the case involves "demotion or disciplinary transfer," as it would seem this case does, the arbitrator is empowered to "determine whether [Rady] had just cause to discipline the employee and, if so, what the appropriate remedy should be." (CBA § 607.)  At the same time, the arbitrator

"shall have jurisdiction and authority only to interpret, apply, or determine compliance with the express language of this Agreement and the agreed upon issue(s) submitted to him/her." These are the essentials of the collective bargaining agreement as far as this case is concerned.

On August 29, 2012, about one week after Bradley received her final warning, the Union filed a grievance on her behalf with Rady.   The grievance challenged everything—Bradley's removal from the Neonatal Emergency Transport team, her corresponding loss of income, her written warning, and her performance improvement plan. It alleged violations of the CBA's requirement that discipline be supported by just cause and that it be progressive.   It sought her reinstatement, the recovery of lost income, and the retraction of the final written warning and performance improvement plan. (Pet., Ex. C.) The Union's grievance worked its way through the process laid out in the collective bargaining agreement, and it was denied at every stage. (Pet., Exs. D–F.)

Next came arbitration.  The Union submitted its demand for arbitration on October 30, 2012, and the parties agreed on an arbitration date of September 4 and 5, 2013. (Pet., Ex. G; Pet. ¶ 17.)  The question then became what issue, precisely, to arbitrate.  This is where the parties are at odds.  Skipping over some back-and-forth between them (*See* Pet., Exs. H–L), going into arbitration Rady was satisfied with the following statements of the issues:

> (1) Did the Employer have just cause to discipline the Grievant when it issued the Grievant a Final Written Warning on August 21, 2012?

> (2) Was the Employer's removal of the Grievant from the NICU CHET team a "demotion" or "disciplinary transfer" as those terms are used in the CBA?

It also agreed to stipulate that if the arbitrator found no just cause, he or she could determine the appropriate remedy if the parties couldn't agree on one within 10 days. The Union, for its part, wanted the statements to read this way:

> (1) Did the Employer have just cause to discipline the Grievant when it issued the Grievant a Final Written Warning and removed her from her CHET assignment on August 21, 2012?

/ /

1                           (2) Was the Employer's removal of the Grievant from the NICU
CHET team a "demotion" or "disciplinary transfer" as those terms

2                           are used in the CBA?

The Union was also fine with the stipulation that gave the arbitrator jurisdiction to determine a remedy only if the parties couldn't agree on one amongst themselves. Obviously the only difference between these statements is the Union's insistence that the arbitrator determine whether Bradley's removal from the Neonatal Emergency Transport—plainly disciplinary in her eyes, but not in Rady's—was supported by just cause. That was the core disagreement going into the arbitration, and it's the core disagreement still.

Arbitration never got going. Rady and the Union tried to agree on the issue to be arbitrated, and the arbitrator tried to help, but in the end they couldn't. This deprived the arbitrator of jurisdiction over their dispute. Naturally, in their respective briefs now before the Court, each party tries to paint the other as obstinate and blameworthy. They do this with excerpts from what must have been an exhausting back-and-forth before the arbitrator, although, to be frank, the excerpts are too long, and too transparently self-serving, to be very helpful. The Court has read the entire transcript and summarizes it as follows.

At the outset, the Union suggested the arbitrator determine whether Rady had good cause to discipline her—and it wanted "discipline" to subsume the final written warning, the transfer, and the performance improvement plan. (Tr. at 9:21–10:4.) Rady wanted the arbitrator to determine whether there was just cause *solely* to issue the final written warning, which it maintained was the only discipline at issue. (Tr. at 11:5–9; 16:12–21; 19:25–20:3.) There's no doubt that Rady lost this opening round. The arbitrator repeatedly pressed Rady that the transfer, too, was disciplinary, and that Bradley was entitled to a finding that there was or wasn't just cause for it—even if there was just cause for the final written warning itself. (Tr. at 11:15–12:10; 13:1–4; 14:25–15:5; 15:23–16:1; 16:22–17:4; 18:6–12.)

Rady then offered another statement, purporting to put Bradley's transfer before the arbitrator: "Did the employer have just cause to discipline the grievant when it issued the grievant a final written warning and transferred the grievant off of the CHET team on or about August 21, 2012?" (Tr. at 22:4–7.) This advanced the ball some, but it still didn't address

the Union's concern, validated by the arbitrator, that the final written warning and the transfer were distinct disciplinary actions and that the arbitrator be commissioned to make an independent finding with respect to each.  (Tr. at 23:14–23; 25:13–27:4.)

At this point, trying to move forward, the arbitrator suggested that the parties stipulate to Rady's statement and put on their respective cases, understanding that the arbitrator saw the transfer as disciplinary but leaving this disagreement to be hashed out in post-hearing briefs.  (Tr. at 27:17–28:19.)  The Union questioned the benefit of this, considering the parties were still sharply divided on whether the arbitrator even had jurisdiction to look at the transfer as an independent disciplinary action taken against Bradley. (Tr. at 29:7–13.)  The arbitrator's proposed accommodation was to relocate the parties' disagreement about his treatment of the transfer from the issue statement into the arbitration itself.  He suggested that he determine if Rady violated the CBA when it issued the final written warning and transferred Bradley.  (Tr. at 31:2–21.)  This would at least be enough to get the arbitration going, and it would give the parties some ruling to challenge in court, if necessary.  Less controversially, the arbitrator offered that the second issue would be the proper remedy, remanded to the parties for ten days to work out amongst themselves.  (Tr. at 32:4–7; 33:12–15; 34:1–5.)

Even though the arbitrator was clear that, in his eyes, the transfer was disciplinary (Tr. at 33:11; 34:24–25; 37:5–6), Rady seemed to be okay with an analysis that simply asked whether it violated the CBA.  (Tr. at 31:18–25.)  This is because framed as a matter of contract interpretation, it allowed for Rady to at least argue that the transfer wasn't categorically disciplinary.  The only thing Rady wouldn't do was agree to an issue statement that assumed just that, and insulated the question from any kind of factual or legal argument. (Tr. at 35:14–19; 37:21–25; 39:19–25; 40:15–18; 41:4–11.)  So, the arbitrator was exactly right.  By framing the issue in terms of the collective bargaining agreement being violated, all the parties were doing was "moving the possible argument down the way."  (Tr. at 35:20–21.)  Rady could make the argument that the transfer wasn't disciplinary in nature (or that just cause supported it), the Union could argue the opposite, and the arbitrator could

determine who is right.  (Tr. at 40:11–15; 49:5–14; 50:9–13.)  The Union just couldn't expect Rady to surrender the argument at the outset and agree to a statement of the issues that deprived it of an argument that the transfer was motivated by administrative rather than disciplinary considerations.  (Tr. at 48:9–14.)

That was the working statement of the issue, then: Did Rady violate the CBA when it issued a final written warning to Bradley and transferred her?  Rady accepted it.  (Tr. at 41:16–20; 43:20–25.)  The Union did not; it wanted the issue broken down into whether Rady violated the CBA with the final written ruling *and* whether it violated the CBA with the transfer.  (Tr. at 34:16–23; 41:22–23; 42:13–15.)  It wanted this, moreover, in spite of the arbitrator's assurances that his analysis would track that approach anyway, even if the formal statement of the issue did not: "The contract has a just cause provision.  Okay.  I'm going to make a determination whether or not either or both of these items were disciplinary in nature.  If either or both of them were disciplinary in nature, the just cause provision applies." (Tr. at 44:14–18; *see also* Tr. at 45:12–19; 46:13–15; 49:5–14.)  Still, the Union stood firm, insisting that the final written warning and the transfer be separated out in the statement of the issues.  (Tr. at 46:16–23; 51:5–6; 54:1–12.)  This was the end of it.  The parties couldn't agree on a statement of the issues and the arbitrator, despite his best efforts, lacked the jurisdiction to proceed.

## II.    Legal Standard

A motion to compel arbitration is considered a complaint for the purposes of Rule 12(b)(6), and it is therefore applicable to Rady's motion to dismiss here.  *Minn. Supply Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*, 822 F.Supp.2d 896, 905 n.10 (D. Minn. 2011).

A 12(b)(6) motion to dismiss for failure to state a claim challenges the legal sufficiency of a complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  The Court must accept all factual allegations as true and construe them in the light most favorable to the Union. *Cedars-Sinai Med. Ctr. v. Nat'l League of Postmasters of U.S.*, 497 F.3d 972, 975 (9th Cir. 2007).  To defeat Rady's motion to dismiss, the Union's factual allegations needn't be detailed, but they must be sufficient to "raise a right to relief above the speculative level . . . ."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  That is, "some threshold of plausibility must be crossed at the outset" before a case can go forward.  *Id.* at 558 (internal quotations omitted).  A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.*

While the Court must draw all reasonable inferences in the Union's favor, it need not "necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations."  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003) (internal quotations omitted).  In fact, the Court does not need to accept any legal conclusions as true.  *Iqbal*, 556 U.S. at 678.  A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement."  *Id.* (internal quotations omitted).  Nor does it suffice if it contains a merely formulaic recitation of the elements of a cause of action.  *Twombly*, 550 U.S. at 555.

All of this said, this isn't the typical motion to dismiss in which the Court looks at a plaintiff's factual allegations and determines whether its claims are facially plausible.  The Union's petition comes with extensive evidence: Bradley's employment contract and the collective bargaining agreement, a documentary history of Bradley's grievance, communications between counsel pertaining to the arbitrator's statement of the issue, and the full-length transcript from the arbitration hearing that wasn't.  If the Court denies the motion to dismiss, it's hard to imagine what additional discovery would be taken, or how the arguments on summary judgment would be different than they are now.  What the parties most likely want now is an *answer*:  Did or didn't Rady refuse to arbitrate?  *See JD Inv. Co., LLC v. Agrihouse, Inc.*, 2009 WL 3320592 at *1 (W.D. Wash. Oct. 13, 2009) (granting petition for order compelling arbitration and denying motion to dismiss at the same time); *United Food & Commercial Workers Union v. Alpha Beta Co.*, 550 F.Supp.2d 1251, 1256 (N.D. Cal. 1982) (same).

**III.    Discussion**

The Union wants the Court to force the parties to arbitrate the following issues:

> 1) Whether the Grievant, Mary Bradley's, transfer from the CHET team was a "demotion" or "disciplinary transfer" as those terms are used in the CBA?
>
> 2) If so, was the transfer for just cause?
>
> 3) Was the final written warning issued to Mary Bradley without just cause?
>
> 4) Whether the performance improvement plan issues to Mary Bradley was "discipline" as that term is used in the CBA?
>
> 5) If so, was the performance improvement plan issued without just cause?
>
> 6) Should the arbitrator find that just cause did not exist in response to issue No. 2 or No. 3 or No. 5, what is the appropriate remedy as to each. (Pet., Prayer ¶ 2.)

The Court sees three framing problems at the outset, before even turning to the analysis.

**A.    Only The Transfer Is At Issue.**

First, it doesn't seem as if each of these issues is actually in dispute.  Rady is fine arbitrating the question whether the final written warning was issued for just cause.  It has also consented to the arbitrator determining a remedy, assuming the parties can't agree on one; counsel for the parties even agreed on this before they appeared in front of the arbitrator. (Pet., Ex. L.)  The Union takes the position now that Rady hasn't agreed to submit the question of a remedy to the arbitrator, but the Court reads the record to suggest the opposite. (Opp'n Br. at 7–8, 13.)  As for the performance improvement plan, Rady *has* taken the position that it wasn't disciplinary.  (Tr. at 12:20–22.)  At the same time, the parties devoted virtually no argument to the arbitrator's treatment of the performance improvement plan during their failed hearing, and they devote little argument to it in their present briefs in this case.  It is the transfer—some combination of (1) and (2)—that is really the issue in this case.

The Union's core complaint is that Rady has never accepted a statement of the issue that would allow Bradley to challenge her transfer *independent of* the final written warning

1  itself.  Absent such a statement, the Union can't argue that even if *some* discipline was

2  warranted, Bradley's loss of her position on the transport team was not.  Rady can't entirely

3  deny that it has taken this position.  Its initial position at the arbitration hearing was that if

4  there was cause to issue the final written warning, there was necessarily cause to transfer

5  her. (Tr. at 13:10–15; 16:18–21.) Otherwise, Rady seems worried that nearly every transfer

6  will expose it to a grievance and potential lawsuit, which isn't what it bargained for in the

7  CBA.  First, the CBA section dealing with discipline doesn't define the term to include

8  transfers.  (CBA Art. V.)  Second, the conversion of every transfer into a grievance would,

9  from its perspective, be an encroachment on management rights.  (Tr. at 21:9–23; 23:20–23;

10  30:16–21.)  The question is whether in subsequent negotiations with the Union it gave

11  enough ground such that it *can* say it was willing to arbitrate the transfer.

12        **B.    The Arbitrator's Authority To Determine The Issue Isn't The Issue**

13        The second framing problem arises with this language in the Union's petition::

14                UNOCH now brings this Petition to compel the parties to submit
   all issues in this case to the arbitrator to avoid another situation

15                wherein the issue statement does not grant the arbitrator the
   authority to remedy a violation of the CBA; and on that basis, the

16                court denies enforcement of the CBA on the basis that the
   arbitrator's authority is defined solely by the issue statement,

17                and not by the issue statement <u>and</u> the provisions of the CBA.
   (Pet. ¶ 54.)

18

19  The question this case presents isn't whether the arbitrator can weigh in something not in

20  the statement of the issue submitted to him, based on his own reading of the collective

21  bargaining agreement.  That was the question in *United Nurses of Children's Hospital v.*

22  *Rady Children's Hospital San Diego*, 12-CV-2552-BEN-BLM (S.D. Cal.), litigated by these

23  very parties.

24        In that case, the parties could only agree to submit the question whether a termination

25  was for good cause to the arbitrator; Rady wouldn't agree to submit the remedy question to

26  the arbitrator as well.  The arbitrator's written decision determined the remedial question

27  anyway, though, on the basis that the collective bargaining agreement clearly envisioned that

28  he would do so.  This Court reversed:

1
2
3
4

> Here, the only agreed upon issue submitted to the arbitrator was the merits issue.   Because the Arbitrator included his determination on the remedial issue that was not submitted to him for determination, the Arbitrator exceeded the power conferred upon him by the Collective Bargaining Agreement and the parties' agreed upon submission.   Case No. 12-CV-2552, Doc. No. 26 at 6.

5   This case is different, because the issue statement on the table clearly puts the entire

6   collective bargaining agreement in front of the arbitrator.   Rady's position, as the Court

7   understands it, isn't so much that it hasn't agreed to arbitrate a certain issue and can't be

8   forced to.   Rather, its position is that it *has* agreed to arbitrate every issue the Union wants

9   arbitrated,   and the Union is just being fussy about the actual formulation of the issue

10  statement.   There is a good amount of posturing from both sides with respect to other

11  arguments, but this is the core disagreement driving this case.   Has Rady refused to arbitrate

12  whether Bradley's transfer was for just cause and what the appropriate remedy should be?

13  Rady might try to argue that the arbitrator's analysis is wrong, but based on the record the

14  Court doesn't see a great possibility of Rady arguing that the arbitrator determined an

15  issue—the transfer—that wasn't submitted to him.

16      **C.     Does The Union Want Rady To Concede The Transfer Was Disciplinary?**

17      The third framing problem has to do with a lack of precision, on the Union's part, in

18  explaining what a failure to arbitrate Bradley's transfer consists in.   On the one hand, the

19  Union seems only to want the arbitrator to be able to ask whether the transfer was

20  disciplinary, and if so, whether it was supported by just cause.   These are the questions, for

21  example, offered in the petition.   (Pet., Prayer ¶ 2.)   Before the arbitrator, too, the Union

22  wanted a determination as to a disciplinary motive for the transfer, and assuming there was

23  one, a determination as to just cause.   (Tr. at 42:16—18.)

24      On the other hand, the Union also indicates that it wants Rady to *concede* that the

25  transfer was disciplinary and for the arbitrator to skip straight to the just cause question.   For

26  example, it titles a subsection of its brief, "RCHSD Refused To Arbitrate Whether The

27  Grievant's Demotion Was For Just Cause And What The Appropriate Remedy Should Be."

28  (Opp'n Br. at 6.)   It then argues that "by way of entering into the CBA the parties agreed that

1    when a demotion or disciplinary transfer is at issue (as in this case), the Arbitrator must

2    determine whether there was just cause to discipline the employee and, if so, what the

3    appropriate remedy should be." (Opp'n Br. at 7.)  It explains that "[t]he crux of UNOCH's

4    grievance is whether RCHSD violated the CBA when it demoted the grievant.  The demotion

5    is what is subjecting the grievant to a less prestigious position and reduced earnings not the

6    written reprimand." (Opp'n Br. at 8.)  These aren't the statements of a plaintiff who wants

7    to *argue* that a transfer was disciplinary; they are the statements of a plaintiff who wants the

8    other side to concede that it was.

9         If the failure to arbitrate is the latter, then there's no doubt that the Union's charges

10   are factually accurate.  Rady will not concede that the transfer was disciplinary.  It at least

11   wants to be able to argue that it was not.  If the failure to arbitrate is the former, then Rady

12   has a plausible defense, which is that it actually agreed to arbitrate every question the Union

13   wants to arbitrate.  The Court concludes that only the former construction of the failure to

14   arbitrate makes sense in the context of this case. The "Discipline" article in the CBA does

15   not define the term, and a separate section pertaining to "demotions" and "disciplinary

16   transfers"—which must be supported by just cause—does not define those terms. (CBA Art.

17   V; § 607.)  That at least leaves it open to argument whether Bradley's transfer was

18   disciplinary, and the Union can't reasonably argue that Rady's refusal to cave on that

19   argument constituted a failure to arbitrate altogether.

20        **D.    Exhaustion**

21        With these framing problems out of the way, the Court has to address Rady's

22   argument that while the Union *did* exhaust its underlying grievance over Bradley's discipline,

23   it did *not* exhaust its present grievance over Rady's alleged unwillingness to arbitrate.

24        The collective bargaining agreement requires that "[a]ny complaint or dispute . . .

25   concerning conduct by RCHSD alleged to be in violation of an express provision of this

26   Agreement shall be resolved by the filing of a grievance in accordance with this Article."

27   (CBA § 602.) Rady says that "[t]his dispute obviously falls within the type of disagreements

28   that are subject to the grievance procedure." (Mot. at 23.)  The Court disagrees.

1   First, Rady doesn't identify any express provision of the CBA that encompasses the
2   Union's present complaint.  And it probably can't.  This dispute arose in the context of
3   arbitration itself, and no provision of the CBA *requires* the parties to agree on a statement
4   of the issue.  This suggests it is a matter of first impression for the Court whether Rady is
5   refusing to arbitrate, rather than a matter for the administrative process.  *See AT&T Techs.,*
6   *Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and
7   unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to
8   be decided by the court, not the arbitrator.").

9   Second, it's unclear what the exhaustion of the Union's present complaint would even
10  look like.  Bradley's underlying complaint about the final written warning and her transfer was
11  first considered, pursuant to the collective bargaining agreement, by Dana Patrick, the
12  Director of Critical Care and Emergency Transport.  (Pet., Ex. D.)  From there, also pursuant
13  to the collective bargaining agreement, it was appealed to the Human Resources
14  Department and considered by upper-level management.  If Rady is suggesting that the
15  Union should have filed a grievance over the failed arbitration itself, and submitted the
16  transcript and various exhibits now before the Court to hospital personnel, that is strange.
17  It is one thing for hospital officials to review the disciplining of an employee for performance-
18  related reasons; it would be quite another for hospital officials to review the hospital's own
19  conduct in litigation.

20  Third, taken seriously Rady's position implies a kind of infinite regress problem.  What
21  it is demanding here, in essence, is that the Union initiate one arbitration over a dispute that
22  arose in another.  But suppose some dispute arises in this new arbitration that can plausibly
23  be said to be related to the collective bargaining agreement.  Will Rady then take the position
24  that the Union must go to arbitration *again*, that is, arbitration over arbitration for failing to go
25  to arbitration?  That would be very messy, and it's hard to believe the collective bargaining
26  agreement envisions it.  The Union exhausted its grievance over Bradley's final written
27  warning and transfer and went to arbitration, and when that arbitration broke down it came
28  / /

1  to Court.  That is as it should be.  The Court won't construe the CBA in a way that turns this

2  case into a nesting doll of grievances and arbitrations.

3        **E.    Discussion**

4        The Court can now turn to the core question in this case, which is whether Rady

5  refused to arbitrate whether Bradley's transfer was disciplinary, and if so, supported by just

6  cause.  From the Court's perspective, the answer to this question turns on whether *at any*

7  *point* in the parties' extensive back-and-forth—both leading up to the arbitration and during

8  the arbitration—Rady agreed to arbitrate these questions.  As can be expected, with the

9  arbitrator's assistance Rady's position evolved during the parties' exchange—as did the

10  Union's.  Therefore the issue statement Rady originally proposed over email, before this

11  case even went to arbitration, is of limited relevance now.

12        The Union argues that Rady "is willing to arbitrate whether the written reprimand was

13  issued for just cause but did not agree to arbitrate the demotion and that is why UNOCH was

14  forced to file a petition to compel."  (Opp'n Br. at 8.)  It argues that Rady "never backed down

15  from its interpretation that the grievant was not entitled to arbitrate the demotion aspect

16  independent of the written reprimand."  (Opp'n Br. at 8.)  It says "[t]here is . . . no question

17  that RCHSD refused to submit the issue of whether Bradley's removal from the CHET team

18  was without just cause despite the language in the CBA providing for such an issue."  (Opp'n

19  Br. at 8–9.)  The Court simply doesn't read the record this way.

20        After an extensive back-and-forth with the arbitrator, Rady agreed to arbitrate whether

21  it violated the CBA when it issued a final written warning and transferred Bradley.  (Tr. at

22  31:18–25.)  It did so on the additional understanding that the question of a remedy would be

23  submitted to the arbitrator if the parties couldn't agree on one amongst themselves within

24  10 days.  (Tr. at 32:1–7.)  By framing the issue this broadly, in terms of the CBA being

25  violated, it left the question of how to treat the transfer open to argument.  The Union could

26  argue that it was disciplinary and not supported by just cause, and Rady could argue that it

27  wasn't disciplinary at all *or* that it was disciplinary and it was supported by just cause. In fact,

28  the arbitrator was insistent that if he was asked to determine, broadly, whether the CBA was

violated, he would look at the final written warning and transfer independently of one another, just as the Union preferred. (Tr. at 44:14–18; 46:11–15; 49:5–15.) He was also very clear that, at least as a matter of first impression, the transfer was disciplinary. (Tr. at 34:24–25.)

The Court is perplexed as to how the Union can argue, in the face of this, that Rady refused to arbitrate the transfer. It refused to concede that the transfer was disciplinary and that the arbitrator's projection of his analysis was right (Tr. at 46:4–7), but that's just a refusal to give up an argument *about* the transfer, not a refusal to arbitrate the transfer in the first instance. And the arbitrator was right: the Union can't demand a stipulation that, in effect, forces Rady to give up that argument. (Tr. at 47:25–48:14.)

Maybe the Union's concern, then, is not that Rady won't give up the argument that the transfer wasn't disciplinary, but that it won't give up the argument that the arbitrator has no jurisdiction to consider the transfer apart from the final written warning. (Tr. at 54:6–12.) The Union doesn't explain how Rady could make this argument when the issue statement explicitly mentions the transfer, but the Court can imagine the following. If the question is simply "Did Rady violate the CBA when it issued the final written warning and transferred Bradley?" Rady might try to argue, during and after the arbitration, that the arbitrator is only commissioned to answer "Yes" or "No" as to both collectively. In the face of that argument, if the arbitrator believes the final written warning was justified but the transfer was not, his answer would still have to be that Rady didn't violate the collective bargaining agreement.

First, the Court doesn't think that's Rady's position. As it reads the hearing transcript, Rady only wants to preserve the argument that the transfer was not disciplinary and that the arbitrator's proposed analysis isn't warranted by the collective bargaining agreement. (Tr. at 37:21–25; 41:4–13.) This is not a jurisdictional argument, but one of contract interpretation. Indeed, at arbitration counsel for Rady said, "Well, by proceeding, I think it's understood, we're not waiving our right to argue that the analytical framework is—should not be," at which point he was cut off by the arbitrator. (Tr. at 46:4–7.) This sounds, however, like an argument about how the arbitrator should construe the collective bargaining

agreement with respect to the transfer, rather than an argument about his jurisdiction to consider the transfer in the first place. So, this is the first point; the Court simply doesn't understand Rady to be clinging to the position that the issue statement deprives the arbitrator of jurisdiction over the transfer. Rady just wants to be able to argue that the transfer wasn't disciplinary, *or* that if it was it was supported by just cause, *or* that the arbitrator's intended approach isn't compelled by the collective bargaining agreement. In the very beginning, when counsel for the parties were trading emails about the statement of the issue, Rady even agreed to the question "Was the Employer's removal of the Grievant from the NICU CHET team a 'demotion' or 'disciplinary transfer' as those terms are used in the CBA?" (Pet., Ex. L.)

Second, if Rady *is* trying to preserve some kind of jurisdictional argument with respect to the issue statement, the Court would likely side with the Union. The collective bargaining agreement is clear that there is such a thing as a "demotion or disciplinary transfer," and that the arbitrator has the authority to determine if there was just cause for one. (CBA § 607.) Maybe Bradley's transfer was a demotion or disciplinary; maybe it wasn't. But by submitting to the arbitrator the question whether Rady violated the collective bargaining agreement when it issued the final written warning to Bradley and transferred her, Rady is probably waiving any argument that the arbitrator can't even resolve that "maybe." What it isn't waiving, of course, is the potential arguments that an unfavorable ruling is wrong for any number of factual or legal reasons. It can make those arguments in a post-hearing motion, and if it's not persuasive it can make it in this Court with a motion to vacate. (Tr. at 50:9–13.) These are motions it is entitled, as a matter of law, to pursue. But if Rady comes to the Court after the arbitration and makes the jurisdictional argument that the transfer wasn't even submitted to the arbitrator, like the remedy in the case before Judge Benitez, the Court would likely reject that argument. Just as the Union isn't entitled to a stipulation that the transfer was a demotion or disciplinary, Rady isn't entitled to dodge entirely the question whether it was, or to argue that a transfer is only disciplinary when it says so. Then it *is* refusing to arbitrate.

1    This is all to say that the Union's fear of going to arbitration, obtaining a favorable

2    ruling, and then, as in the case before Judge Benitez, losing that ruling because the

3    arbitrator exceeded his authority are unwarranted. (Opp'n Br. at 13.)  It is unwarranted, first,

4    because the Court does not expect that Rady will challenge a ruling on this ground.  It is

5    unwarranted, second, because if Rady *does* make this argument the Court will likely find

6    against it, finding that the language of the issue statement entitles the arbitrator to look at

7    the transfer, determine if was a demotion or disciplinary, and if so if it was supported by just

8    cause.  In the case before Judge Benitez, the arbitrator's ruling plainly went beyond the

9    scope of the issue statement.  The statement was limited to the merits, and the arbitrator,

10   consulting the collective bargaining agreement, detoured to determine a remedy.   In this

11   case, the issue statement puts the final written warning and the transfer in play, and simply

12   asks if the CBA was violated.  It will be a much harder sell that the arbitrator lacks the

13   jurisdiction to look at the transfer independently.

14       The Union relies upon *Socony Vacuum Tanker Men's Ass'n v. Socony Mobile Oil Co.*,

15   in which the Second Circuit held that "the court may state the question to be arbitrated" *even*

16   *when*, as here, a collective bargaining agreement limits the arbitrator's jurisdiction to a

17   question that's mutually agreed upon.  369 F.2d 480, 483 (2d Cir. 1966).  Looking past

18   Rady's argument that *Socony* has no Ninth Circuit analog and can't stand in light of recent

19   Supreme Court caselaw, the case is distinguishable from this one.  The court's concern in

20   *Socony* was the emasculation of an arbitration clause—that is, one party avoiding arbitration

21   altogether, even when a dispute is clearly arbitrable, simply by not agreeing to a question for

22   the arbitrator.  *Id.*  There are at least two differences between *Socony* and this case.

23       First, the two issue statements on the table in *Socony*, even though reasonable in the

24   court's eyes, were very different, so different in fact that someone reading just the

25   statements wouldn't know they pertained to the same dispute.  *Id.* at 482.  In such a

26   circumstance, where there is a true impasse, it makes more sense for a court to step in and

27   force a question on the parties.  In this case, however, the arbitrator here told the parties that

28   / /

he saw no meaningful difference between their proposed statements and that his analysis would be the same whichever statement was submitted to him.  (Tr. at 52:1–53:17.)

The second difference, of course, is that Rady was willing to go forward, let the Union present all of its facts and arguments to the arbitrator, and go from there.  It just wasn't willing to waive  certain arguments.  It wasn't willing to waive the argument that the transfer wasn't disciplinary, or if it was, that it was supported by just cause.  It wasn't willing to waive the argument that the arbitrator's pre-announced analysis was inconsistent with the collective bargaining agreement.  And it wasn't willing to waive the argument that the statement at issue limited the arbitrator's jurisdiction with respect to the transfer.  Reasonable or unreasonable as those arguments might be—and the Court has already weighed in on the jurisdictional one—Rady is entitled to cling to them; it is entitled to make them to the arbitrator, and it is entitled to come to this Court, if the arbitration doesn't go its way, with a motion to vacate.  The Union cites no authority for the proposition that *that* posture—simply being a fierce adversary in litigation—is tantamount to refusing to arbitrate in the first instance.

## IV.    Conclusion

For all of the above reasons, Rady's motion to dismiss the Union's petition is **GRANTED**, and the petition is **DENIED**.  The big picture here is the critical one.  Rady was willing to arbitrate the very broad question whether it violated the CBA when it issued the final written warning to Bradley and transferred her from her current position to another one. The arbitrator was repeatedly clear that this would give the parties the opportunity to present all of their evidence and arguments, obtain a decision, and go from there—preserving all of their concerns about the arbitrator's analysis and jurisdiction for post-hearing motions or for a motion to vacate before this Court.  (Tr. at 46:8–15; 47:1–6.)  Rady was willing to go forward, and the Union was not.  Rady refused to waive certain arguments, sure, but the Court doesn't find that a steadfast litigation posture going into arbitration amounts to the refusal to arbitrate altogether.  Even the jurisdictional argument that the issue statement doesn't put the transfer in front of the arbitrator—which the Court doesn't even understand

1   Rady to be making, and which it would likely reject—is an argument that Rady is entitled to

2   press.

3        To be very clear, as the Court reads the record, *the most* Rady wants to be able to

4   argue is that the arbitrator's proposed framing isn't compelled by the collective bargaining

5   agreement, and that is a fair argument to make when the question is whether Rady violated

6   the collective bargaining agreement.  It an argument about the proper interpretation of a

7   contract, not an argument about the arbitrator's jurisdiction.  In any event, the Court won't

8   go so far as to say to the parties, "A pox on both your houses," as the arbitrator predicted

9   it might.  (Tr. at 53:15–16.)  The parties are in litigation, and this is what parties in litigation

10  do: they play tough.  But the Court will tell the parties to go back to arbitrator, present their

11  best cases, and come back to the Court if necessary once the arbitration is final.

12       **IT IS SO ORDERED**.

13  DATED:  May 9, 2014

14

15  **HONORABLE LARRY ALAN BURNS**
    United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28